KUYKENDALL v. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-252-CR

JOHN COLUMBUS KUYKENDALL APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 415TH DISTRICT COURT OF PARKER COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Appellant John Columbus Kuykendall appeals his conviction for possession of pseudoephedrine, with the intent to manufacture methamphetamine.  After the jury found Appellant guilty, the trial court assessed Appellant’s punishment at ten years’ confinement and a $2,000 fine. In two points, Appellant contends that the evidence is legally and factually insufficient to sustain his conviction.  We affirm. 

FACTUAL BACKGROUND

Officer Chris Crawford, a sergeant with the Weatherford Police Department, responded to a police dispatch regarding a noise disturbance at a residence in Weatherford.  When he arrived at the location, he saw a gray truck with the engine running and idling loudly; however, no one was standing near the truck.  Officer Crawford heard a noise coming from the screened-in porch
(footnote: 2) that was attached to the home, and he called out asking if anyone was at home.  He yelled out numerous times, but no one responded.  Officer Crawford heard a shuffling noise that sounded like items being moved around, and he called out again, “Is there anybody here?”  He went to the back of the house to knock on the back door, and as he got closer, he walked into an intense smell of what appeared to him to be anhydrous ammonia coming from the back porch area.  He acknowledged that he had never smelled anhydrous ammonia in the past, but he was aware that the odor is generally associated with methamphetamine labs.  The smell was so intense that it took Officer Crawford’s breath away.  Officer Crawford also observed an extension cord and water hose going into the home and a gasoline can by his feet. 

Because no one at the house responded to Officer Crawford’s repeated attempts to contact people inside, he called dispatch and requested a back-up unit to assist him.  Officer Crawford also contacted Officer Wesley Stout, an investigator with the Cross Timbers Narcotics Task Force and informed him of what he had observed.  Officer Stout said that he would assist Officer Crawford in obtaining a search warrant for the residence.  Officer Tommy Taylor arrived, and Officer Crawford briefed him as to what he had observed.

While the officers were standing outside, Appellant came to the front door of the house.  The officers made contact with Appellant at that time and saw what appeared to be smoke permeating throughout the living room area behind Appellant.  Officer Taylor asked Appellant whether there was anyone else in the house.  Appellant informed the officers that another person, later identified as Monty Thompson, was there taking a nap.  Because of the intense fumes emitting from the back of the house, officers asked if they could come inside and check Thompson’s welfare.  Appellant allowed the officers into the house.  As Appellant led the officers into the room where Thompson was apparently sleeping on the bed, the officers observed two incense candles burning on top of the television.  The officers spoke with Thompson, learned that Thompson was the owner of the house, and obtained his consent to search the premises. 

The officers noticed that there was water and a bottle of bleach on the bathroom floor, and a strong smell of bleach was emanating from the bathroom.  Once on the back porch, Officer Crawford again encountered an extremely intense smell of anhydrous ammonia that caused him to lose his breath and made his eyes water.  The smell permeated through the house, and in Officer Crawford’s opinion, no one could be in the house without noticing the smell. 

Officer Crawford spoke with Appellant outside.  He explained to Appellant that he was not under arrest and that he was free to leave anytime.  Appellant informed him that he understood what was explained to him.  Officer Crawford asked Appellant what he was cooking, and Appellant told him he was cooking methamphetamine.  Officer Crawford testified that he then asked Appellant if he was attempting a red phosphorous or a Nazi-style cook, and Appellant responded that he did not know.  Officer Crawford asked Appellant whether there was any finished product, and Appellant stated that he did not know what he was doing and that he did not know if there was any finished product.  Appellant informed Officer Crawford that he and Thompson were both “cooking the meth.”  Officer Crawford testified that this was the extent of his conversation with Appellant.  Officer Crawford testified that during his conversation with Appellant, he did not observe anything about Appellant that would indicate that the chemicals in the house had an effect on Appellant’s thought process.

Officer Jason Kennedy, an investigator with the Cross Timbers Narcotics Task Force, arrived at the location to investigate.  Because of the strong chemical odor, he wore a respirator mask when he went into the house.  Officer Kennedy testified about the items found at the house and how the items are utilized in the manufacturing of methamphetamine.  He acknowledged that the items that he discussed could be used for general household purposes.  Officer James Peel of the Weatherford Police Department and the Cross Timbers Narcotics Task Force testified about the process of manufacturing methamphetamine and described how many of the items the officers found in the house are used to manufacture methamphetamine.

Officer Kennedy testified that, with the exception of two buckets that were together with the reacting liquid in them, most of the items he found in the house were concealed, for example, behind the dryer and doors.  In Officer Kennedy’s opinion, it appeared as though Appellant and Thompson were attempting to destroy the pseudoephedrine and other items they used in the methamphetamine lab.

In the bathroom, Officer Kennedy found a trash can that had been overturned as if something had recently been dumped or washed out of it.  Inside the back door, the officers found a black bag that had several cans of starter fluid and a coffee grinder.
(footnote: 3)  The officers sampled the powdery substance inside the coffee grinder, and put the substance in a plastic bag to submit to the laboratory for testing.  The laboratory test results showed that the powdery substance was 0.19 grams of pseudoephedrine, a precursor to methamphetamine.  The officers did not find any finished product at the home. 

Appellant testified that Thompson was a friend of his sister’s.  He testified that he went to Thompson’s house to find his sister.  He arrived at Thompson’s house with only the things in his pocket, his billfold, keys, a pocketknife, and a pair of scissors.  According to Appellant, when he arrived at Thompson’s house, Thompson was surprised to see him; Appellant had only seen him twice before at another house, but they were not friends.  Appellant went inside Thompson’s house and spoke with Thompson for a few minutes.

Appellant testified that when he got up to leave Thompson’s house, Thompson told Appellant that he could not leave until he helped Thompson “clean up his mess.”  According to Appellant, he was at Thompson’s house for approximately an hour and a half.  Appellant smelled a strong odor in the house.  Appellant testified that he helped Thompson, who walked with a cane, clean out some buckets, but he had no idea what the buckets contained.  Appellant testified that none of the items the officers described as being used in the process of manufacturing methamphetamine belonged to him.

Appellant testified that he first realized Thompson was involved in manufacturing a chemical when the officers arrived at the house.  Appellant stated that he attempted to answer the door to the house for the officers two or three times, but Thompson would not allow him to.  Appellant remembered that Thompson gave him four or five different scenarios or stories to tell the police.  Appellant testified that by the time he answered the door to speak with the officers, the fumes in the house were strong, and he did not remember the details of his conversation with the officers because he was in a “faded-out period at that time.”  He did not remember making the statement that he was trying to make methamphetamine but he didn’t know what he was doing.  He testified it was not his intent to help Thompson make methamphetamine; he was just cleaning up a mess.  Appellant stated he did not know anything about the pseudoephedrine that officers found in the coffee grinder.  Further, he did not recall telling Officer Crawford that he was making methamphetamine, though he made it clear that he was not saying that he did not tell Officer Crawford that he was making methamphetamine, just that he did not recall saying that. 

LEGAL AND FACTUAL SUFFICIENCY

Appellant argues that the evidence is legally and factually insufficient to affirmatively link him to the 0.19 grams of pseudoephedrine residue found in a coffee grinder sitting in an opaque black tote bag stowed behind a door near the back porch of Thompson’s home.

1. Standard Of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) when the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment and, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
. 

In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

2.  Applicable Law

Health and safety code section 481.124(a) provides the following:

(a) A person commits an offense if, with intent to unlawfully manufacture a controlled substance, the person possesses or transports:

(1) anhydrous ammonia;

(2) an immediate precursor; or

(3) a chemical precursor or an additional chemical substance named as a precursor by the director under Section 481.077(b)(1).

Tex. Health & Safety Code Ann.
 § 481.124(a) (Vernon Supp. 2005).  The indictment alleges that Appellant, “did then and there, with intent to unlawfully manufacture a controlled substance, namely methamphetamine, possess an immediate precursor, to-wit: pseudoephedrine.”  The jury charge authorized the jury to find Appellant guilty of the charged offense either as the primary actor or as a party.

The jury returned a general verdict finding Appellant guilty of the charged offense.  When a jury returns a general guilty verdict on an indictment charging alternative theories of committing the same offense, the verdict stands if the evidence supports any of the theories charged.  
Brooks v. State
, 990 S.W.2d 278, 283 (Tex. Crim. App.), 
cert. denied
, 528 U.S. 956 (1999).

To prove unlawful possession, the State must prove that the defendant exercised actual care, custody, control, or management over the contraband and that he knew the matter possessed was a contraband. 
 See 
Tex. Health & Safety Code Ann.
 § 481.002(38) (Vernon Supp. 2005)
; 
Poindexter v. State
, 153 S.W.3d 402, 405 (Tex. Crim. App. 2005); 
McQuarters v. State
, 58 S.W.3d 250, 259 (Tex. App.—Fort Worth 2001, pet. ref’d).  Whether the evidence supporting a conviction for unlawful possession of a controlled substance is direct or circumstantial, it must establish, to the requisite level of confidence, that the accused’s connection with the drug was more than just fortuitous under the “affirmative links” rule.  
Brown v. State
, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995).  

Some relevant factors that may affirmatively link an accused to contraband include: (1) the defendant’s presence when a search is conducted, (2) whether the contraband was in plain view, (3) the defendant’s proximity to and the accessibility of the narcotic, (4) whether the defendant was under the influence of narcotics when arrested, (5) whether the defendant possessed other contraband or narcotics when arrested, (6) whether the defendant made incriminating statements when arrested, (7) whether the defendant attempted to flee, (8) whether the defendant made furtive gestures, (9) whether there was an odor of contraband, (10) whether other contraband or drug paraphernalia were present, (11) whether the defendant owned or had the right to possess the place where the drugs were found, (12) whether the place where the drugs were found was enclosed, (13) whether the defendant was found with a large amount of cash, and (14) whether the conduct of the defendant indicated a consciousness of guilt.  
Olivarez v. State
, 171 S.W.3d 283, 291 (Tex. App.—Houston [14th Dist.] 2005, no pet.). 

The first factor weighs against Appellant because he was present when the search was conducted.  
See id. 
 The second factor weighs in Appellant’s favor because the pseudoephedrine that was found in the house was not in plain view; rather, it was found in a coffee grinder in a black bag behind a door.  
See id.
 

The third factor relates to Appellant’s proximity to and the accessability of the narcotic.  See 
id.
  Appellant was not in the same room as the pseudoephedrine; when the officers approached Appellant, he was at the front door and the pseudoephedrine was near the back of the house.  However, circumstantial evidence existed to connect Appellant with the contraband before he opened the door.  Officer Crawford testified that he heard some shuffling of items on the back porch just before he knocked on the back door, and he stated that he heard someone open the door.  The bag containing the contraband was found just inside the back door.  Appellant testified that he assisted Thompson in cleaning up the house before he answered the door.  Additionally, Appellant informed Officers Crawford and Kennedy that he and Thompson were cooking methamphetamine.  Appellant could not confirm or deny making the statements; however, he testified that he could not recall making the statements.  The truthfulness of Appellant’s statements is bolstered by the fact that the officers found various chemicals and other methamphetamine production paraphernalia in the house.  

The evidence also reflected that Appellant and Thompson were in the process of concealing or destroying the evidence that indicated they were in the process of manufacturing methamphetamine.  For example, the trash can was overturned in the bathtub, the open bleach container indicated that Appellant and Thompson were attempting to cover up other smells in the bathroom, and Officer Crawford heard shuffling noises when he approached the house.  Furthermore, Appellant testified that he carried buckets from the back porch  where the contraband was found to the bathroom where Thompson was scrubbing out the buckets in the bathtub.  Considering all of this evidence, the third factor weighs against Appellant because the pseudoephedrine was accessible to him.  
See id. 

The fourth factor weighs in Appellant’s favor because there was no evidence that Appellant was under the influence of drugs or narcotics when he was arrested, and Officer Crawford testified that he did not believe that Appellant was under the influence when they spoke.  
See id.
  The fifth factor relates to whether Appellant was in possession of any other contraband when he was arrested.  
See id.
  There was no evidence that Appellant was in possession of any other contraband when he was arrested.  The seventh and thirteenth factors also weigh in Appellant’s favor because no evidence existed establishing that he attempted to flee the house or that the officers discovered a large amount of cash at the location.  
See id.
   

Significantly, though, Appellant did make some incriminating statements to the officers before his arrest; thus, the sixth factor weighs strongly against Appellant.  
See id. 
 He informed Officer Crawford that both he and Thompson were “cooking the meth.”  When Officer Crawford questioned him regarding whether he was attempting a Nazi-style or a red phosphorous method, Appellant responded that he did not know.  Later, Appellant informed Officer Kennedy that he and Thompson were trying to cook methamphetamine, but they did not know what they were doing.

The eighth factor relates to whether Appellant made furtive gestures.  
See id. 
 While there is no evidence that Appellant made any furtive gestures in the presence of the officers, there is ample evidence that he made furtive gestures after the officers arrived at the scene but before he opened the front door because he was attempting to destroy the evidence relating to the manufacturing of the methamphetamine.  By his own admission, Appellant acknowledged that he was assisting Thompson in cleaning up the house.  The record also reflects that it took Appellant some five to ten minutes to open the door to the house, and during that time Officer Crawford heard shifting noises from inside the house.

The ninth factor relates to whether there was an odor of contraband at the house.  
Id.  
While there was no evidence of an odor of the pseudoephedrine, there was a strong odor of the anhydrous ammonia—an item that, along with pseudoephedrine, is utilized in the process of manufacturing methamphetamine.  The tenth factor weighs against Appellant.  
See id.
  The officers did not find any finished product or other narcotics at the residence; however, the officers did find a hypodermic syringe in the plastic tote found on the back porch.  Additionally, officers recovered a vast amount of paraphernalia relating to the manufacturing of methamphetamine. 

The eleventh affirmative links factor weighs in favor of Appellant because the record reflects that Thompson, and not Appellant, was the owner of the house.  
See id.
  Arguably, the twelfth factor weighs in Appellant’s favor because the contraband was discovered in an enclosed area in a coffee grinder inside a black bag in the house.  
See id.
 

Finally, as required by the fourteenth affirmative links factor, Appellant’s admissions to the officers that he was cooking methamphetamine indicate a consciousness of guilt that he was attempting to manufacture methamphetamine, although he admitted that he did not know what he was doing.  
See id.
  Appellant’s consciousness of guilt is demonstrated by attempts to mask the strong chemical odors in the house by lighting the incense candles and pouring bleach in the bathroom.  Additionally, the fact that the methamphetamine lab was partially cleaned up demonstrates his consciousness of guilt.  According to the officers, their observations of the scene led them to believe that the occupants of the home were trying to hide or disguise the fact that the methamphetamine lab was present.

Although many of the affirmative links weigh in Appellant’s favor, certain factors weigh heavily against him.  The fact that Appellant made damaging admissions that he and Thompson were in the process of making methamphetamine weighs strongly against him.  Appellant was unable to confirm or deny these statements, and the fact that he was attempting to destroy or conceal the evidence that related to the manufacturing process corroborates those statements.  It is not the number of affirmative links present that is important, but rather the “logical force” that they create to prove that the defendant committed the crime.  
Nhem v. State
, 129 S.W.3d 696, 699-700 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

We conclude that the evidence, when viewed in the light most favorable to the verdict, supports a determination beyond a reasonable doubt that Appellant was in possession of the pseudoephedrine and that he had an intent to manufacture methamphetamine.  Additionally, when viewed neutrally, the evidence is not so obviously weak or so greatly outweighed by contrary proof that it would not support the finding of guilty beyond a reasonable doubt.  Accordingly, we overrule Appellant’s first and second points. 

CONCLUSION

Having overruled each of Appellant’s two points, we affirm the trial court’s judgment.  

PER CURIAM

PANEL F:  HOLMAN, DAUPHINOT, and GARDNER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  JULY 6, 2006

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
The officers described this area as the “screened-in porch,” the “back porch area,” and the “back room.”  For consistency, we will refer to the area as the back porch.

3:
The officers described this item where the pseudoephedrine was found as both a coffee grinder and a pill grinder.  For consistency, we will refer to the item as a coffee grinder.